Good morning, Your Honors. Nick McFarlane. In this case, I represent only Sgt. Rick Dottke. Mr. Jerry Moberg represents the rest of the defendants. And Mr. Moberg and I have agreed to split our time down the middle. So we'll talk for ten minutes. There are a number of issues that are before the Court today on this discretionary review. However, I think the probable focus point of the Court, or at least what I believe will be the focus point, is the issue of qualified immunity and whether or not my client, Sgt. Dottke, is entitled to qualified immunity from Mr. Rogers' 1983 claims. As the Court is, of course, well aware, in order to establish qualified immunity under the Saucier v. Katz analysis, there is a two-step analysis that we go through, the first one being what's sometimes referred to as the constitutional inquiry. And that simply asks whether or not Mr. Rogers, in this case, was deprived of constitutional right. And if the answer to that question is no, then we don't move on to the following prong of the analysis, and the decision has to be that Sgt. Dottke is entitled to qualified immunity. The second prong in the analysis, if the first prong is determined to be that Mr. Rogers was indeed deprived of a constitutional right, is whether or not the case law was clear at the time of the act in question that the conduct that Sgt. Dottke was engaged in was, in fact, violative of Mr. Rogers' constitutional rights. In this case, Mr. Rogers claims that as a result of the canine track, which unfortunately and accidentally led to Mr. Rogers, who was an innocent third party, being attacked by the dog, violated his court amendment right to be freed from unreasonable seizures. Since the argument or the claim is that Mr. Rogers had his court amendment rights violated, the proper analysis to determine whether or not he indeed had a constitutional right violated is the Graham v. Connor analysis, which weighs the conduct in question of the officers versus the need for that conduct. Mr. McLaughlin, when we look at this record, we don't have to make a decision initially, but it appears that a decision was made that they had the right man. It was not an investigatory dog release. It was he's here, we've got him, and we've got him now, and we're going to get him. Does it make a difference? I'm speaking a little out of turn here because when the dog was actually released from its lead, my client, Sergeant Dobke, wasn't at the scene and wasn't involved in releasing the dog. Well, somebody said it was accidental, too. I think there is a dispute, a disputed fact as to why Deke, the canine, was released from its lead. What I think is undisputed is that after being released, for whatever reason he was released, the dog, unbeknownst to the officers and unintendedly, jumped either through or over the fence into the backyard that Mr. Rogers was sleeping in. Except this record also shows there's no way for him to jump through or under or over the fence because the fence was a solid barrier. So there are a lot of facts that aren't established as well as maybe you'd like. There may be a disputed fact as to whether the dog, Your Honor, went over the fence or through the fence, but I think it's undisputed that the officers did not know the dog was going to go into that backyard and that they did not intend for the dog to go into that backyard. I think the dog handler that released the dog from its lead testified that he did so because the lead was tangled and in part because the dog was working what he defined to be a confined area in this driveway adjacent to the backyard that Mr. Rogers was sleeping in. But your client set everything in motion. Your client set everything in motion. Your client called for the dog. There appears to be a factual dispute. Your client says he didn't intend for the dog to be used to apprehend but only to search for someone. The dog handler says, no, he thought his instructions were to apprehend. Correct. So given those facts and the fact that your client was in radio communication, why does that immunize you from your client from liability simply because he wasn't at the scene? It immunizes my client from liability because the decision in the first place, the setting the fact or the ball in motion, wasn't an unconstitutional decision. And for the purposes of your decision today, you have to view the facts in light most favorable to Mr. Rogers, and that requires assuming that the instruction given by my client was to track and apprehend this fleeing misdemeanor. That decision to track and apprehend the fleeing misdemeanor wasn't in and of itself an unconstitutional decision. Go ahead. Because there's – if you use the Graham v. Connor balancing test and look at the facts and circumstances that were facing Sergeant Dopke at the time with the decision to track and apprehend this fleeing misdemeanor, the balance tips clearly in favor of Sergeant Dopke. Well, it may or may not depend on what the offense was. He knew what the offense was, at least. The arrest offense, doesn't that get into the balancing test? What he did know, Your Honor, is that the original offense for which he attempted to pull Mr. – what the Troy individual over for was a minor offense, no question. But what we also know is that Troy attempted to evade being put in – How do we know? Because, first of all, he wouldn't stop for the siren and the lights. He drove down to the garage, the garage door closed. He certainly didn't close it. Somebody did, and he went through the house. And the information we were operating on at the time, pursuant to the testimony of the witnesses, was that he fled out the back door. Well, your client didn't believe he fled out the back door. The reason your client, according to his testimony, wanted the dog is he wanted to rule out the fact that there was a scent in the back because he really believed that this Troy was in the house. And I will – Sorry. So you set a motion, assuming the facts most favorable to the plaintiff, which we do at this point, that your client authorized an apprehension by the dog to someone he didn't believe existed and a release of the dog in the neighborhood at night in a residential area without probable cause going from backyard to backyard? It depends on when you look at Sergeant Dobke's state of mind, because there's no question that when he went into the house and he called the dog to be sensitized to the backyard, he did not believe that he was getting the straight story from the occupants of the house. And that was one of the purposes for bringing in the dog, is to try to flush out the story. And the occupants said you can come in, right? Correct. And look around. Nobody went into this mythical garage where this moped or whatever it was drove into, right? Correct, Your Honor. I mean, so right then and there, I mean, we do know that this person, whether his name was Troy or something else, that he sort of zipped into the garage, correct? Correct. So nobody does anything with that. Your officer doesn't believe that he's been given the straight scoop. But then he gives the authority to bring in a canine unit, correct? Correct. And going back to not going into the garage, Your Honor, I think that really lies in the theory of negligence. Was it negligent not to go sensitize the dog to the moped? And he didn't. He decided to sensitize the dog to where this allegedly fleeing suspect left the back of the house. Which he didn't believe was actually back there in the first place. He didn't. So anyone could have been going through the backyard. Well, the dogs trained, of course, to pick up a scent, and what they tried to do was sensitize the dog to pick up a scent of someone leaving the back of the house. And that's where we get to Sergeant Dottie's state of mind changing from, I don't believe these people to, well, yes, they're telling me the truth, because the canine told Sergeant Dottie through its actions. Okay. So let's take the first part. Let's say you're right that simply authorizing the use of the, I mean, I'm trying to break this down into phases. So if using the dog, in your view, is not excessive force or is not in violation of the Constitution, what about when the officers call in and talk to him? Because they talked to him in the process, correct? I don't know that there's any evidence in the record that there was any contact between the canine handlers and Sergeant Dottie during the actual track. Okay. So in your view, it rises and falls on whether the initial decision is violative. I don't, Your Honor, because of an issue I didn't raise yet, but I'm sure Mr. Mobert is going to go into, and that is the fact that Mr. Rogers was accidentally attacked by this dog takes this case out of the realm of the Fourth Amendment. There is a lot of case law that very clearly says that in order for there to be a Fourth Amendment. I understand when you say accidentally. Do you mean the dog didn't intend to attack him? I'm saying the officers did not intend to effectuate a seizure of Mr. Rogers through use of the dog. It's very akin to the cases cited in our briefing where an officer pulls over a traffic. Against the dog, but they didn't intend for the dog to do its duty. They didn't intend for the dog to do its duty to Mr. Rogers. That's correct. And because of that, this case is absolutely akin to the dog who escapes from the patrol car and attacks somebody that the officer has pulled over for speeding. It's akin to cases where officers' bullets go astray and accidentally hit an individual, and where courts in those cases have found there's been no intention by the officers to effectuate a seizure. What about the Fourth Circuit case, Bathacon? I mean, isn't that this case? They go into the house, they get the wrong person, it's an accident? No. It's not, Your Honor, because in the Bathacon case, the officers intended to get whomever it was in the bedroom. They sent the dog in to get that person. Well, didn't these guys intend to get whomever was out there that attached to this scent? Yes, they intended to. So what's the difference? Because they intended to get a fleeing misdemeanor who they believed was running through the neighborhood, and they never intended to have the dog enter the backyard and attack Mr. Rogers. But in the Bathacon case, which is very close to this, they didn't intend to get this poor night duty nurse who happened to be sleeping there. And the only difference is that in this case, Mr. Rogers is sleeping in the backyard instead of in a bed. So I'm having some trouble making that distinction. I think this is the difference. If the officers had spotted or a thief had sent it to the backyard that Mr. Rogers was sleeping in and indicated to the officers that the suspect was in there, and the officers then intentionally sent the dog in to get whomever was in that backyard, then we'd be squarely within the Bathacon case. But we're not because the officers never intended Deke to go into that backyard. Well, that's a question I suppose you want us to save for your colleague. I will give the remaining time. I've used more than my ten minutes, so unless there are any further questions. No, thank you, counsel. Thank you. Mayor, let's put ten minutes on the clock. We'll give you ten minutes. Thank you, Your Honors. My name is Jerry Moberg, and I represent the dog handler, Officer Cohen. And also I represent Deputy Quackenbush, the sheriff's deputy, who is in the search phase of this case and also Officer Bonnelly. And I want to focus on that part of the case. Officer Cohen was directed to go ahead and look for a fleeing suspect, and the dog had alerted on a scent. And I want to focus to the point in time then where they come to an area outside of the fenced yard where Rogers was, and the dog was sniffing around with some cars and vehicles and appeared to be very active and got tangled in a leash. At that point, Officer Cohen released the leash in order to untangle it and allowed the dog to work in what was a confined area. There was a fence, a house, and some vehicles in that area, and the dog was close to him. The dog then unexpectedly bolted from that location, got over the fence, and contacted Mr. Rogers. And I think that if we're looking at this from a constitutional perspective, unless Officer Cohen had directed the dog to go into the closed fence yard area, his actions were at best negative and do not meet the constitutional test that this Court has established in terms of a violation of constitutional right. It can't inadvertently seize or inadvertently violate the constitutional right of Mr. Rogers. You know the problem, and you can tell me whether I'm wrong, maybe I am. The dog handler, the trainer, saw the agitated state of the dog. Doesn't he have some obligation to know what that means and what a dog is likely to do if he releases him? He may and does. But at that point, there's no evidence in this record that the officer made any purposeful or intentional directive to that dog. I'm not suggesting that. I'm suggesting you say, not in the record. Flex, I'm not suggesting, you're not saying what happened. The dog was in an agitated state. He was twisting and turning and moving, and he released him. Well, doesn't he have some obligation to know what's going to happen when he releases a dog in that state? According to the handler, he said, yeah, he released him, and from his training experience, that told him that in that area, the confined area that the dog was working in, not over the fence, that there was likely a suspect there. Well, if that's the case, why didn't he give a warning? I mean, all these cases talk about if before you're going to stick a dog on somebody or let him loose, then you give a warning. And I guess it's undisputed there were no warnings here. Is that correct? But I don't think a warning is the issue here, because in the area that they were in where he was searching, the dog was searching in the confined area. So there was no warning. But I don't also think under the cases, the Kula case and the other cases, there's a need for a warning there. Why? Because at that point, they're still searching the area. I mean, you can't know. No, no, wait. Let's just stop right here. Let's say this guy is hiding under the car. They talk about, well, a lot of times people hide under trucks and cars and that sort of thing. This dog was trained, as I understand it from your client's testimony, that if he found someone on that scent, then he was trained to seize and bite, basically. Is that correct? Yes, that's correct. Okay. So now they're outside. The dog is alert. He's agitated. And it seems likely that this person is right in this vicinity. So according to your client's testimony, his job is to seize and bite and hold, correct? If there's some indication that there is, in fact, a person in that area. And I think it's irrelevant because the contact that was made was in an area where the dog was not scented. The dog went. No, wait, wait. You see, you're not answering my question. Okay, I'm sorry. You're kind of saying, well, gee, he wasn't in this area, so it's no problem. As it turned out, the officer was lucky. He wasn't under the car. But having taken him off the leash, wasn't this dog's mission to find a person who matched the scent and then to bite and hold? Would you agree with that? Yes, I would agree with that. Okay. And what the expert for Mr. Rogers says, and, you know, could be proven right or wrong if the case goes to trial, he says, once the dog's released from the leash, he's receiving a nonverbal command to search for and apprehend by attacking and biting a suspect. So why does it matter that, by luck, the suspect isn't under the car? He just happens to be over here instead. Because I think that for there to be a constitutional violation, there has to be a knowing or intentional act by the police officer that is clearly prescribed in the case law and they were known of. And the fact that he releases the dog, I mean, the dog is searching when he's on the leash as well. When he releases the dog, the dog is continuing to do what it was doing. And I think it is an entirely different matter when the dog jumps the fence unexpectedly. Whether he should have given a warning or not. If he had been on the leash, he wouldn't have jumped the fence unexpectedly, would he? He probably would not have. Okay. But to get back, I think to Judge McKeown's point, let's assume that this person had been innocent and just happened to be working under his car at that time. Now, your officer, as I recall, testified that he thought there was somebody under the car. So the evidence says that he didn't give a verbal warning at that point, right? Right. So why isn't that significant? Because that's not where the contact was made. No, but I mean, the fact is, you leave, there's no verbal warning. Okay. The dog is released, and the dog at least has then its mission to attack. And it picks a scent and jumps the fence. Now, just because it's not in a confined area, why does that change our analysis? Because I think all the cases that talk about it talk about a confined area, where an officer says, I'm going to send a dog into a confined area, and I'm going to tell the dog to find. The Vatican case is one. I'm going to tell the dog to find who's ever in there. The officer has to give a warning under that circumstance. But I don't think the case law was defined in 2003 to say that if you release a dog in an open area and he's out looking, much like the Coo case where he was on a longer leash and was going through the grass, that you have to keep yelling, I have a dog, I have a dog, I have a dog. No, I don't think that's the point. I think the point is that perhaps your officer thought he was in a confined area and didn't comply with constitutional requirements. As it turns out, the person wasn't there. But then isn't it reasonably foreseeable that the dog is not going to have the same idea of the confined area that the officer does? I mean, it's probative of the constitutional violation for him to have said, to have taken no action before he takes off the leash, I think. Well, I guess, to turn around, if he had given the verbal warning there in that confined area and the dog, and the event still happened, the dog jumped the fence, would that then make the argument that the fence constituted? I think your argument is stronger for an unintended consequence as opposed to this. And I think that's exactly it. The unintended consequence was, and he may have been negligent in taking him off the leash, but that doesn't make him constitutionally deficient. It doesn't make him constitutionally incompetent. But unintended consequences, if they were initiated by a willful act, then are actionable under 1983. Right. So the theory is, and we have to, I mean, just I'm playing it out so you can respond and you can thought through it, of course, is that the willful act is taking the dog off the leash in a confined area when the dog is going to attack and hold the suspect. And the fact that he goes out of the confined area then is the unintended consequence. But the initial act is willful. It's the unintended consequence, and it is much like the Chase cases. The willful act of the officer may be to pursue the fleeing suspect. The unintended consequence of that may be an accident involving a third party. And I think the same constitutional principle applies. He can be negligent. We can be critical of him. But I don't think we can be constitutionally critical of him because the dog unexpectedly bolded, went into an area he did not expect the dog to go. What doesn't matter here, I mean, we kind of glossed over the fact that Mr. Cohn testifies as far as he knows. You know, it's a misdemeanor guy. There's no question of a weapon. There's no question of prior record like there are in other cases. And basically your officers are on private property searching for somebody for a minor misdemeanor with no warrant. Doesn't that matter under the weighing test? As to my clients, the direction was and the information they had was that there was a person who was fleeing, who was in some stage of unrest and who had left the scene, had gone through a private residence and was out in the middle. You know, you have to when you have to kind of put a little polish on it. You had a shirt off. Yes, sure. Yes. OK. Try and get down. So. So at that point, I think that my officers viewpoint of what he knew was sufficient for him. And the direction got from his supervisor was sufficient for him to constitutionally continue to search and locate the suspect. So I think that when you balance it from the standpoint and the viewpoint of my officer, that I think that he is perfectly constitutional. I want to reserve two minutes and I haven't gotten to the excessive force claim. Of course, any questions? I should quickly get through your argument. The other issue that I think is a question here is, was the force used in order to subdue Mr. Rogers after the dog inadvertently jumped the fence and contacted the constitutional? I believe it was. I believe it was for a couple of reasons. Number one is at that point, the dog had contacted the plaintiff. The police officers had to do something. I don't think they could have left the dog there and gone to get a warrant, as was suggested at least in one argument. They could have called off the dog. What they did is they went in there. They yelled commands. They told them. Stop fighting. Stop fighting. As opposed to. And at that point, I think the record is clear that the police procedures would require that for police zone safety, that they not, they don't know if this man is dangerous. He's fighting the dog and he could be armed. And so they're going to approach him. They're not going to release the dog until they know they have him subdued and handcuffed. That's police procedure. And they use the force necessary to get that done. Mr. Rogers admits that he resisted that force. He fought them because he thought they were somebody else. Because they were burglars and he said. And it was reasonable, wasn't it, under the circumstances? There had been no yelling, that he had no notice. He was there and he had some people attacking him. Well, except you have to look at it from the viewpoint of the police officer at that point and constitutionally. And the officers yelled a command that the police officer identified them and said that they had visual contact and they were in uniform. And. Isn't that disputed? No. What Mr. Rogers says is I didn't hear the commands and I looked up and I saw the police. I saw these people. I saw these people. Stop fighting once he understood. So there's some dispute of, you know. Now, the jury could well believe that, of course, the officers said what they typically would is police, you know, stand down. But he disputes that. So that's an issue. And he doesn't have his glasses on at the time. That's right. He doesn't have his glasses on. He thinks he hears a burglar. He settles down and a dog attacks him. And then he says he didn't hear any commands and we have to assume the facts at this stage. And then he knows he hadn't committed any crime. And then he says after he stops fighting, he gets kneed repeatedly in the back. He gets two hammer, hammer, two or three hammer blows to the head. In addition to the dog bite. I disagree. He says after he stopped fighting. During the course of his resisting, those blows were administered. And he had his hands under his belly and he didn't bring them out. Once he realized there were police officers, all the fighting stopped. All the contact stopped. But what I wanted to say was I think you have to view the constitutional issue from the standpoint of the police officer. Not what Mr. Rogers knew or thought, but what the police officer knew or thought to decide whether it was a matter of law or constitutional violation. And I want to go quite that far because these people weren't investigating. They were arresting who they knew was the escaping misdemeanor. They were arresting a person they believed to be the suspect. They had no doubt about it. They weren't investigating. They were going to make an arrest of who they reasonably unreasonably believed was the guilty party. And here's the innocent party who knew he had committed no crimes. He was sleeping outside. But he and he's being attacked. We have to look at it, don't we? Who do we view the facts most favorably? Well, you view the facts most favorably to the plaintiff, except when you determine the police officer's duty. You have to view it from the viewpoint of the police officer, not the person being arrested. I think it's time to expire. I want to reserve. No. Well, actually, on your. Yeah. We'll give a little bit of time. Thank you. Good morning. May it please the Court. I'm Brian Eiler, one of the attorneys for Mr. Rogers. The key to this case is its procedural status. This is an interlocutory appeal on qualified immunity decisions. In that status, Mr. Rogers' version of the facts, along with supported by substantial evidence, must be accepted. In this case, we all want to believe that our police officers are doing the right thing and that they're telling the truth. But we can't believe the police officers' claim in this case that this was just some big mix-up because the officers contradict each other. No, we just read the record. We don't believe and not believe. We read the record and see what shows, don't we? Correct. All right. The police officers contradict each other. Their stories are internally inconsistent. Their stories are inconsistent with what Mr. Rogers has testified to. And it's just contrary to common sense, given the accepted facts of what happened. In this instance, the police were pursuing, according to Officer Dopke, those were his words. That's what he told his superiors when they were investigating this. They were pursuing this person who failed to stop a little big bike, this big, moped-style bike, pulled into a garage. The resident slammed the door down behind him, and then the officers were told that this person had run out the back door. That's the crime, the criminal, that they're pursuing. Well, let me take you ahead a little bit. Let's talk about Officer Dopke first. Let's assume that what he says is true, that he did not intend and didn't instruct the K-9 officers to let the dog go. And he says in his testimony that that may have been error, but it's not his error because he thought his instructions were correct. Now, I know you dispute that, but what I'm asking you to assume, under that, if that is true, where's the constitutional violation on his part? Because Dopke instructed Cone to engage in an illegal search of the Feds' backyards. This is Dopke's testimony, even if we believe Dopke. And it's page 8 of our brief. Question. Okay. So it would seem to me that sitting or standing in Officer Cone's shoes that you, Dopke, as supervisor, were directing him to use the K-9 to track the suspect in the backyards of other people that night. Answer. Yes. Question. In this residential neighborhood. Answer. Yes. Question. And that would include entering the fenced area backyards of these homes. Answer. Yes. Question. Without a warrant. Answer. Yes. Question. Without asking permission of the owners to enter their property. Answer. Yes. This is a clearly illegal search. So I gather by that recitation, what you're arguing is, regardless of what happened with the dog, that the seizure was unconstitutional. Is that your position from that testimony? Well, we have – our position is that this was no accident. Our version of the story is that these officers, as reflected by the record, took this dog out the back door, sent it into the corner where Troy supposedly run over the fence, took him around to exactly that house, sent it to Troy, Troy found the scent, the dog, Deke, found the scent, and then was released. Under our expert's testimony, who's familiar with this kennel that trained this dog, that's a nonverbal command to find and apprehend by biting and holding. And they – this is the backyard where the scent was found by Deke from the house where the moped driver supposedly left. So I think at the very least, there's a reasonable inference that there was no accident involved here. In fact, Deke's handler testified that he thought it prudent to unleash Deke and let him work. This wasn't just unleashing Deke to untangle the leash. According to Deke's handler, it was unleashing him to let him work. And we can assume that as a dog handler for some six years, these officers know what a dog can do. We all know what an N-shaped German shepherd can do. So just to break down your claims, with respect to Officer Dopke, is your claim that because he knew they would be going into private fenced property without a warrant for a misdemeanor, that he unleashed, in effect, a constitutional violation? He initiated the chain of events of a constitutional violation. The first violation being sending Deke into the backyard. And whether or not – Now, if we disagreed with you on that, it seems that there's – he didn't know that they would unleash the dog, correct? Well – Or that they would unleash a dog without a warning. Your Honor, I think there's a reasonable inference from the record in this case that Dopke knew or should have known that Deke would be unleashed. Dopke testified that he knew these dogs were unleashed for controlled area searches. Cone, Deke's handler, Quackenbush, another officer that was on the scene and engaged in the beating that they gave to Mr. Rogers, he was a former dog handler. They both told the Kennewick Police Department investigators that it was a common and accepted practice. The captain of the Kennewick Police Department testified it was a common and accepted practice to unleash these dogs and let them go through neighborhoods in search of suspects. Now, if all of those people knew, including the captain, who presumably spends more time in the office than in the field, isn't there a reasonable inference that Dopke knew or should have known that this was possible? How was Deke going to get into the fenced backyards? That's what Dopke intended. Well, if – breaking it down as we talked before, that's unleashing the first event. The second big event seems to be dog off the leash. And the municipal defendants say that that was an accident once he was off the leash in terms of what he did. They never intended him – they didn't intend him to jump the fence and go see somebody. So how do you account in a 1983 case like this, at this posture, for police immunity when, in fact, there is an accident, what happened was accidental? Your Honor, again, under the plainest version of the facts, there is no accident. I believe that this tangled leash is a red herring. A conscious decision was made to allow Deke to work off leash. Well, let's suppose there wasn't, though. I mean, let's – because we're breaking this down for constitutional analysis. Let's suppose that Deke had jumped out of the car or somehow escaped from the car and this accident, this event had occurred. Would you agree that there's no constitutional violation? I agree that there's case law that is on point that says exactly that. All right. So you disagree with case law that says that. I don't even disagree with that case law, Your Honor. Certainly, if there had been no deployment of Deke at all, which the Kennewick Police Department investigated and determined is what should have happened here, Deke should have never been used on leash or off leash. Certainly, if he just accidentally jumped out of the car and ran off and bit somebody, there's no constitutional violation. Okay. Let's take it then one step closer. Let's assume that everything – that we believe the officers and that there was no intent to have him bite and hold, and you dispute that and facts and the records support that, but this is hypothetical, and that, in fact, the only intent was the leash gets tangled up and they release him from the leash and then he runs and jumps. What's your constitutional analysis? Constitutionally, if there were no order or command to the dog that the officers knew or should have known would result in an injurious contact with the suspect or an innocent person, then there would be no constitutional violation. And your case is they took him off the leash. He was supposed to work. Work meant bite and hold. And then their position is, well, we had Deke confined to this area, and what is your response to that? When he gets out of the area, why is there a constitutional violation? Well, Your Honors, I hope saw the diagram of the area in which the search occurred. Open to the street, open to the yards on the side, open to the neighboring yard in the back. The only area that was any sense enclosed was the backyard where Deke went and bit Mr. Rogers. Now, even if you accept, although you can't, even if you accept this argument that because of the cars, this was somehow a confined area, then you get into the situation, which Judgment Count already asked about. Then you're releasing the dog into the confined area under the car without shouting the warning, which everybody agrees was clearly established law at the time Deke was released. So then you get to a third phase, and I don't know that this actually ultimately breaks down in these phases analytically, but just now they're in the backyard or the dog is in the backyard and he's biting and holding. Is it unreasonable at that point, when they think they have their suspect, to at least continue to hold him until the person submits? Because we have this Miller case where they say, you know, releasing the dog and letting him hold somebody for, I guess it was just under a minute, wasn't unreasonable because that's the way you have them. And so until they submit, the dog needs to do his duty. Why is this case not like the Miller case where they said it wasn't a constitutional violation, at least at that phase? Well, this case is different because there, first of all, was absolutely no information that any of these officers had to indicate that the suspect, Troy, was in any way dangerous. And to me, those questions just are questions that the jury has to answer. If this really was an accident, then they had no basis to believe that Rogers was the suspect at all. And if that's the case, why would they allow Deke to continue biting him, break down the fence, beat him to a pulp, tear out a staple in his knee, and keep letting the dog bite him? If the dog picks up the scent of Mr. X, Troy, then why wouldn't the officers reasonably believe now we found Troy or Mr. X? Well, I think they did. This is the difficulty of arguing this case at this point. I mean, even after they got Rogers and Rogers was telling them he's innocent, they hold him in the car for 45 minutes. So if they thought it was Rogers, does that justify them sticking the dog on him until he submits? Maybe. Does it justify them coming in with mag flashlights, three of them beating Mr. Rogers so severely he has a permanent hearing loss, tears out a staple that had been in his knee for 20 years, and then, if you read the record carefully, they allowed the dog to continue biting him even after they had him on the ground and under control. There's, to me, a continuation of the attack issue. Even assuming that they thought, as I think they did, they had the right man. They still can't continue the use of force beyond what's necessary to subdue Rogers. I can't help but wondering what happened to Deke. Is it in the record or not? Pardon? What happened to Deke? Is it in the record? I've seen nothing in the record that indicates Deke got hurt. Deke's on a desk job. Actually, the newspaper reported that Deke retired about a year ago, I think it was. So Deke is no longer with the police department as far as I understand. Deke's not a defendant anyway, correct? No, he's not a named defendant. We ruled him out as not having any capacity to compensate. Returning to the period in which your client was in the car, is there anything in the record that indicates that the injuries were aggravated by the period of detention in the car? I cannot answer whether they were aggravated beyond the fact that they were allowed to fester and not be treated. I think that's an important point to make also in this case. He wasn't just sitting in the car for identification purposes. If you read the testimony, he was in the car being told, you should have just pulled over and you wouldn't have had to go through this. Admit you did it. We know you did it. This was part of the interrogation process, as he's there bleeding and bloody with his knee torn up, to try to get him to admit that he had done something that he hadn't done. And so I think that that is the bad intent, if you will, that the officers displayed at that point in time, instead of just taking him to the police or to the hospital and having him treated. He's not going anywhere at this point. How long does it take to have the people from around the block walk around and say, no, that's not Troy, 45 minutes to an hour? That's how long the record indicates he was kept in the car. At any rate, from the plaintiff's perspective on this appeal, all of this is fact driven. I think there's more than ample evidence to create genuine issues of material fact as to what happened, what the officer's intent was, that precludes qualified immunity under the federal constitutional plaintiffs. I think it's even clearer under the state law immunity that the denial of summary judgment on state law immunity was appropriate, because under state law, the bad part... You may not have jurisdiction to address that. Well, I would urge that you guys not address that, but I did come across the case very recently within the last month, and I can't recall the name of it, where a Ninth Circuit panel did decide that there was interlocutory jurisdiction on state law immunity. So I just want to remind the Court that the Babcock v. State case, says that you do not get immunity as a public officer or official unless you follow all of the laws, statutes, and regulations. If you step out of the legal, statutory, regulatory framework, then you're not immune under Washington State law. And we think, given what we feel are obvious questions, in fact, as to the federal constitutional violations, the illegal search, I mean, that's something that just gets lost in there. Nobody wants to talk about the intentional illegal search, that we feel that the defendants clearly are not entitled to state law immunity claims, or state law immunity. So, Your Honor, unless any of Your Honors have additional questions at this point, I'd rely for other issues on our briefing, and we would urge that the Court affirm Judge Shea's decision denying qualified immunity and denying the summary judgments that these defendants sought. Thank you. Thank you, counsel. We'll give you two minutes each for rebuttal. Thank you, Your Honors. I don't think I'll even take the two minutes. I just wanted to briefly address the contention that the authorization for the search of this fleeing misdemeanant was illegal in the first place because it encompassed going into backyards and searching this residential neighborhood at night. That search, or that order, was not unconstitutional because it encompassed looking in backyards of this residential neighborhood. We have to remember that at the time, Sergeant Dopke did believe that we had a fleeing misdemeanant who, as counsel has pointed out, there was no evidence in the record that he was dangerous, but by the same token, there was no evidence in the record that he was not dangerous. What we do know is that he avoided, or we believed he was somebody who was avoiding contact with law enforcement. If he had run into somebody's house, would the officer have been able to go in there without a warrant? I believe he would have, Your Honor. Under what authority? The hot pursuit of this individual. I think that once then the individual left out the back door, I think that that increased the potential. If he didn't have authority to go into the house, I think that he did then have the authority to check the neighborhood because now we're dealing with the potential danger to neighbors because we have an unknown person who, for unknown reasons, does not want contact with law enforcement. And the alternative... An unarmed person on a mini-moped? We don't know if he's armed or not. What was the more serious crime involved as opposed to the misdemeanor traffic stop? There wasn't. There wasn't a more serious crime involved, but we didn't know that. All we know is that... See, that would justify, it would turn upside down all the law because you could say in every case, well, we didn't know that he might not have a felony record or that he might not have drugs or that he might not have been armed, but I don't think that's the standard. It has to be based on some reasonable belief. And the only reasonable belief here was that he wasn't armed and that he was a shirtless mopeder. That was evading contact with law enforcement. Correct. And I'll just end with this point because I see I am out of time. The alternative, Your Honor, which makes no sense, is that we just throw our hands up in the air and say, this guy got one on us, and send the message that all your misdemeanors, if you can get away, we're not going to follow you. We're not going to change the law. The law is established. Are you suggesting that if we rule as you're suggesting, it makes some change? I think it would be a change. It would be a change because that is not the law that if misdemeanors get out of our sight, they're free to go because we don't have the opportunity. No, we're not. The question isn't whether they're free to go. I think the only question we're looking to see is whether the court was right in denying, isn't that the only thing that's before us? That is, but the issue came up because the contention was thrown out there that it was illegal to search for this fleeing misdemeanor because it would encompass going through people's homes. That isn't going to be the thing. It's that only thing unless you want us to go further than I think this case requires. Thank you, Your Honor. Thank you, Counselor. I'm reminded one of my profs, when I was fortunate enough to attend this institution, told me that sometimes hard facts have high potential to make potentially bad law. It's unfortunate that this dog bit and held an innocent person, but I think if you focus on that, we have a tendency to forget the constitutional significance from the officer's standpoint. This is not a question of whether or not the officer was negligent. The plaintiff has to establish that the officer was purposeful. If he was just negligent or if there's a question of fact about whether he was negligent or not, there's no constitutional violation. And in regards to the officers that I represent, unless there's something in the record to establish that the handler purposely released that dog into that backyard to contact anyone in there without a warning, then he has not committed a constitutional or unconstitutional violation. And he was innocent of that. Can we stop short of that? I'm sorry? Can we stop short of that point? Don't we have to look at what the officer knew or reasonably should have known? From the standpoint of whether or not he makes a constitutional violation, the officer would have to reasonably know that there is case law that says if you have a dog under your control in a confined area and take off the leash and that dog unexpectedly jumps the fence and contacts somebody, you violate the Constitution. There's no case law that would support that. Sure. I know when you add unexpectedly. But if you know the dog and you know he's working and you know he's good and you know he believes he's got the suspect, he's going to do what you know he's going to do. And what the officer said was, and that was to stay in the area that I'm working him in, that that's what I know he would do. And that may well be true, but you also have to contend with Roger's expert's statements to the contrary, don't you? What the expert says is that by taking him off the leash, it's a nonverbal command. And I don't think that the law that was established at the point of this incident was clear enough that it would let an officer know that taking expert aside, taking the leash off amounts to a nonverbal command to go jump the fence. That's factual, not legal, isn't it? I mean, that relates to what dogs do and don't do as opposed to what the law does. That doesn't have anything to do with the law. Well, it does if you decide that it is a nonverbal command. If you're going to equate the officer's taking him off the leash with the officer saying, sick him, then I think that establishes a new and different case law. And so I don't think it's factual in that standpoint. I think that the officer, from the officer's standpoint, he believed that he had control over that dog and the dog had respect for the dog. Thank you. The case just heard will be submitted. I'm going to thank counsel for their arguments, and I think we should depart from this and give them all applause for their fine performance today. Thank you.
judges: Farris, Thomas, McKeown